UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NATIONAL UNION FIRE INSURANCECOMPANY
OF PITTSBURGH, PENNSYLVANIA, ET AL.                           PLAINTIFFS

v.                                        CIVIL ACTION NO. 3:12-CV-00677-CRS

PAPA JOHN'S INTERNATIONAL, INC., ET AL.                        DEFENDANTS

## **MEMORANDUM OPINION**

This matter is before the Court on the following motions:

> 1) cross motions for summary judgment (DNs 21, 25) filed by Plaintiffs National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") and American Home Assurance Company ("American Home") (collectively "Plaintiffs"), and Defendants Papa John's International, Inc., and Papa John's USA, Inc. (collectively "Defendants");
>
> 2) a motion for leave to file supplemental authority (DN 50) filed by Plaintiffs.

For the reasons set forth below, the Court will:

1) grant the motion for summary judgment filed by Plaintiffs;
2) deny the motion for summary judgment filed by Defendants; and
3) deny as moot the motion for leave to file supplemental authority filed by Plaintiffs.

## **BACKGROUND**

Unless otherwise indicated, the following facts are undisputed. Defendants are insured under several commercial general liability ("CGL") policies issued by Plaintiffs covering different time periods.[1] Although issued by different companies at different times, each of the policies provided coverage for liability incurred by Defendants for "property damage" and

---

[1] From October 1, 2006–October 1, 2008, Defendants were covered by CGL policies issued by American Home, and from October 1, 2008–October 1, 2012, Defendants were covered by CGL policies issued by National Union.

"personal and advertising injury" resulting from their business operations. As defined in the policies, "property damage" consists of either: 1) "[p]hysical injury to tangible property;" or 2) "[l]oss of use of tangible property that is not physically injured." In order to qualify for coverage, any property damage must be "caused by an 'occurrence,'" which the policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In pertinent part, the policies define "personal and advertising injury" as "injury, including consequential 'bodily injury,' humiliation, mental anguish, or shock, arising out of… oral or written publication in any manner, of material that violates a person's right of privacy."

Importantly, the policies' coverage for property damage and personal and advertising injury were subject to an exclusion for "Violation of Statutes in Connection With Sending, Transmitting, or Communicating Any Material or Information." Specifically, the exclusion provided that:

> This insurance does not apply to any loss, injury, damage, claim, suit, cost or expense arising out of or resulting from, caused directly or indirectly, in whole or in part by, any act that violates any statute, ordinance or regulation of any federal, state or local government, including any amendment of or addition to such laws, that includes,[2] addresses or applies to the sending, transmitting or communicating of any material or information, by any means whatsoever.

In July 2010, a class action lawsuit was filed against Defendants in the United States District Court for the Western District of Washington alleging that Defendants unlawfully sent unsolicited text messages to the class plaintiffs' cellular telephones between October 2009 and April 2010. According to the complaint, Defendants encouraged its franchisees to employ an advertising company called "ONTIME4U" to send text messages advertising Defendants' products to the cellular telephones of residents of Seattle, Washington. Accordingly, the class plaintiffs have asserted the following causes of action against Defendants:

---

[2] The word "includes" appears only in the American Home policies and is thus absent from the National Union policies.

1) Violation of the Telephone Consumer Protection Act ("TCPA");
2) Violation of the Washington State Consumer Protection Act ("WSCPA"); and
3) Negligent marketing practices by failing to properly supervise or train its franchisees and allowing them to access class plaintiffs' private cellular telephone numbers.

Ultimately, the district court certified a national class consisting of "All persons in the United States of America who were sent, to their cellular telephone numbers, at least one unsolicited text message that marketed a Papa John's branded product, good, or service through ONTIME4U." Upon Papa John's appeal, the Ninth Circuit upheld the district court's certification of the national class.

Since its inception, Plaintiffs have consistently denied that the class action lawsuit qualifies for coverage under the terms of Defendants' CGL policies. According to Plaintiffs, the lawsuit does not seek damages for either "property damage" caused by an "occurrence" or "personal and advertising injury" as those terms are defined in the policies. Furthermore, even if coverage were held to exist, Plaintiffs claim that the policies' exclusion for "Violation of Statutes in Connection With Sending, Transmitting, or Communicating Any Material or Information" negates any such coverage because the alleged transmission of unsolicited text messages clearly violated the TCPA.[3]

Accordingly, on October 17, 2012, Plaintiffs filed the present action seeking a declaratory judgment establishing the absence of coverage for the class action lawsuit under Defendants' CGL policies. On February 6, 2013, Plaintiffs filed a motion for summary judgment (DN 21), arguing that there was no genuine dispute that the class action lawsuit failed to qualify for coverage under the terms of the policies. On April 4, 2013, Defendants filed a cross motion for summary judgment (DN 25), arguing that the damages alleged by the class plaintiffs

---
[3] For unknown reasons, the parties have not addressed whether coverage exists based on Defendants' alleged violations of the WSCPA.

qualified as both "property damage" and "personal and advertising injury" and that the exclusion for violations of statutes defeated its reasonable expectations as the insured and therefore must be invalidated.

On October 29, 2013, Magistrate Judge James D. Moyer conducted a status conference wherein he determined that the parties should be granted an opportunity to file supplemental memoranda discussing any relevant legal authority that had been issued since the initial filing of the motions for summary judgment. (DN 41). On November 22, 2013, the parties each filed their supplemental authority briefs. (DNs 44, 45). In their response to Plaintiffs' supplemental authority brief, Defendants argued that several cases and arguments relied on by Plaintiffs were available during the initial briefing period and therefore were not properly considerable as supplemental authority. (DN 49).

Having considered the parties' briefs and being otherwise sufficient advised, the Court will now address the motions for summary judgment.

**STANDARD**

Before granting a motion for summary judgment, the Court must find that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of establishing the nonexistence of any issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), a burden which may only be satisfied by "citing to particular parts of materials in the record..." or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). If the moving party satisfies this burden, the burden of production shifts to the non-moving party, who must then identify evidence demonstrating the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322.

4

In resolving a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party fails to satisfy its burden of counterproduction, the court must grant the motion for summary judgment.

**DISCUSSION**

The Court will begin by discussing whether coverage for the class action lawsuit exists under either the "property damage" or "personal and advertising injury" provisions of the policy. Because we conclude that coverage exists for "personal and advertising injury," the Court will not address the parties' arguments related to the "property damage" provision.

As previously discussed, the policies provide coverage for any damages that Defendants become legally obligated to pay as a result of "injury, including consequential 'bodily injury,' humiliation, mental anguish, or shock, arising out of… oral or written publication in any manner, of material that violates a person's right of privacy." Because the terms "publication" and "right of privacy" are not defined in the policies, the parties base their respective arguments on what they believe is the proper interpretation of these terms. According to Plaintiffs, the plain and ordinary meaning of these terms requires that, in order to qualify for coverage, the alleged injury must have arisen from the dissemination to third persons of information that the class plaintiffs intended to be kept secret. In other words, Plaintiffs claim that the provision only covers a

5

violation of the right of privacy insofar as that right is understood as a right to secrecy. By contrast, Defendants argue that the plain and ordinary meaning of the terms extends coverage not only to violations of a person's right to secrecy, but also to violations of a person's right to seclusion such that harassing or unwanted communications would also qualify for coverage. As conceded by both parties, neither the Sixth Circuit nor the Kentucky Supreme Court have yet addressed the proper interpretation of these terms. Thus, in resolving the parties' dispute, resort must be had to the decisions of other jurisdictions.

For their part, Plaintiffs cite *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543 (7th Cir. 2009), in support of their argument that only a violation of a person's right to secrecy is within the scope of the policies' coverage for "personal and advertising injury." In *Auto-Owners Ins. Co.*, the Seventh Circuit considered the proper interpretation under Iowa law of the term "right of privacy" under a CGL policy which, like the policies in the case at bar, provided coverage for advertising injury consisting of "injury arising out of… [o]ral or written publication of material that violates a person's right of privacy." *Id.* at 549. After noting that the policy did not define "right of privacy," the Court recognized that this "phrase can have multiple meanings and refer to a variety of rights." *Id.* As explained by the court:

> The RESTATEMENT (SECOND) OF TORTS identifies four ways in which one's right of privacy can be invaded: (1) unreasonable intrusion upon another's seclusion; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that places another in a false light. We have previously organized these rights into two broad categories—rights involving secrecy interests and rights involving seclusion interests. Secrecy interests involve the right to keep certain information confidential; seclusion interests involve the right to be left alone. For example, "[a] person who wants to conceal a criminal conviction, bankruptcy, or love affair from friends or business relations asserts a claim to privacy in the sense of secrecy. A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion."

*Id.* (citations omitted).

Because Iowa courts had yet to address the proper interpretation of the term "right of privacy," the court was attempted to predict the proper interpretation of the provision under Iowa law. In so doing, the Court reasoned as follows:

> It is true that Iowa, like Illinois, gives undefined words in an insurance contract their ordinary meaning. However, Iowa also refers to closely related or associated policy language to illuminate the meaning of insurance-coverage provisions. We… read the policy's use of the word "publication" in the advertising-injury definition to narrow the scope of the "privacy rights" referred to in the same clause. The provision provides coverage for "oral or written publication of material that violates a person's right of privacy." The most natural reading of this language is that it covers claims arising when the insured publicizes some secret or personal information—not claims arising when the insured disrupts another's seclusion.
>
> …
>
> The other subsections of the definition of "advertising injury" also support this interpretation. The other three provisions of the advertising-injury definition focus on harm arising from the content of an advertisement rather than harm arising from mere receipt of an advertisement. The surrounding provisions cover advertising-injury claims for libel, slander, misappropriation, and copyright infringement—all of which require the examination of the content of the offending advertisement. It is therefore reasonable to infer that subsection (b) also concerns harm emanating from the content of an advertisement; that is, it is reasonable to read subsection (b) to refer only to violations of secrecy interests.

*Id.* at 550 (citations and footnotes omitted). Accordingly, the Court concluded that, because "[t]he underlying suit here only involves seclusion interests," the policies' advertising injury provision did not provide coverage for claims under the TCPA.

In response, Defendants cite *Owners Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 819 (8th Cir. 2012). In *Owners Ins. Co.*, the court addressed the proper interpretation under Minnesota law of a similar advertising injury provision covering damages resulting from injuries caused by the "oral or written publication of material that violates a person's right of privacy." *Id.* at 819. Like the policy at issue in *Auto-Owners Ins. Co.*, the term "right of privacy" was not

defined and the court therefore attempted to discern its plain and ordinary meaning. *Id.* In so doing, the court reasoned as follows:

> We conclude that the ordinary meaning of the term "right of privacy" easily includes violations of the type of privacy interest protected by the TCPA. Our court has previously stated that violations of the TCPA are "'invasions of privacy' under the ordinary, lay meaning of the phrase."
>
> …
>
> Moreover, the plain meaning of "publication" is broad enough to include the dissemination of fax advertisements. "Publication" has multiple definitions, including "communication (as of news or information) to the public" and "the act or process of issuing copies... for general distribution to the public." Webster's Third New International Dictionary (2002). While the word can have the narrower, tort based meaning urged by the insurers of publicizing "secret or personal information," its ordinary meaning is broader. We conclude that sending fax advertisements is a form of "publication" because such transmissions fall within the definition of communicating information generally.

*Id.* at 820–21 (citations and alterations omitted). Based on these considerations, the court concluded that "[t]he policies' reference to violating a 'right of privacy' thus encompasses the intrusion on seclusion caused by a TCPA violation for sending unsolicited fax advertisements, and the term 'publication' includes dissemination of faxes." *Id.* at 821.

Because this is a matter of first impression in Kentucky, we must "decide unsettled issues of state law as a Kentucky court would decide them." *Kelly v. McFarland*, 243 F.Supp.2d 715, 717 (E.D. Ky. 2001) (citing *Overstreet v. Norden Laboratories, Inc.*, 669 F.2d 1286, 1289–90 (6th Cir. 1982)). Under Kentucky law, the interpretation of an insurance contract is a question of law for the court. *See Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006); *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002). "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." *Logan Fabricom, Inc. v. AOP P'ship LLP*, 2006 WL 3759412, *2 (Ky. Ct. App. December 22, 2006). "[I]n the absence of ambiguity, a

written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (internal quotation marks omitted). However, "[i]f the contract language is ambiguous, it must be liberally construed to resolve any doubts in favor of the insured." *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

After reviewing the case law from other jurisdictions, the Court concludes that a Kentucky court would likely follow the rationale of *Owners Ins. Co.* and the majority of other circuits by holding that the plain and ordinary meaning of the personal and advertising injury provision is sufficiently broad to include violations of a person's right to seclusion. *See, e.g.*, *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1250 (10th Cir. 2006); *Hooters of Augusta, Inc. v. Am. Global Ins. Co.*, 157 Fed. Appx. 201, 206–07 (11th Cir. 2005) (unpublished); *W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co.*, 96 Fed. Appx. 960 (5th Cir.2004) (unpublished), *aff'g* 269 F.Supp.2d 836 (N.D. Tex. 2003). OXFORD ENGLISH DICTIONARY (3rd ed. 2007) defines "privacy" as: 1) "the state or condition of being alone, undisturbed, or free from public attention, as a matter of choice or right; seclusion; freedom from interference or intrusion;" and 2) "absence or avoidance of publicity or display; secrecy, concealment, discretion; protection from public knowledge or availability." Clearly, this definition encompasses both a right to seclusion ("the state or condition of being alone, undisturbed, or free from public attention, as a matter of choice or right") as well as a right to secrecy ("absence or avoidance of publicity or display"). Thus, the Court cannot accept Plaintiffs' argument that the

9

term "right of privacy" must be restrictively interpreted as including only a right to secrecy. Instead, the Court will construe the term in accordance with its plain and ordinary meaning as also including a right to seclusion.

OXFORD ENGLISH DICTIONARY (3rd ed. 2007) defines "publication" as "[t]he action of making something publicly known." Importantly, nothing in this definition restricts its meaning to the act of making *a secret* publicly known. To the contrary, the Court concludes that the term's plain and ordinary meaning extends to any dissemination of information, whether or not secret, to either the public at large or any person not previously in possession of the disseminated information.

With this understanding in mind, it is beyond cavil that the class plaintiffs' claims based on Defendants' alleged violations of the TCPA seek damages for "injury… arising out of… oral or written publication in any manner, of material that violates a person's right of privacy." Accordingly, the Court concludes that the class plaintiffs' claims qualify for coverage under the policies' "personal and advertising injury" provision.

Having concluded that coverage exists for the "personal and advertising injury" alleged by the class plaintiffs, the Court must next determine the applicability and enforceability of the policies' exclusion for "Violation of Statutes in Connection With Sending, Transmitting, or Communicating Any Material or Information." As set forth in the policies, this exclusion provides that:

> This insurance does not apply to any loss, injury, damage, claim, suit, cost, or expense arising out of or resulting from, caused directly or indirectly, in whole or in part by, any act that violates any statute, ordinance or regulation of any federal, state or local government, including any amendment of or addition to such laws, that includes, addresses or applies to the sending, transmitting or communicating of any material or information, by any means whatsoever.

(Endorsement, DN 23-2, at 78). According to Plaintiffs, because the personal and advertising injury suffered by the class plaintiffs resulted from Defendants' unlawful transmission of text messages in violation of the TCPA, the violation-of-statutes exclusion negates any coverage otherwise existing under the policy.

In response, Defendants have advanced several arguments. First, Defendants argue that the exclusion is so broad that it renders coverage under the policy illusory and that it must therefore be invalidated. Specifically, Defendants emphasize that the exclusion is applicable not only to a violation of a statute committed by the insured, but to *any* violation of a statute committed by *any* person. According to Defendants, "no reasonable layperson would expect to be excluded from coverage under his commercial liability policy when *the insured himself took no part in the prohibited actions*…" (Resp., DN 26, at 20) (emphasis in original).

In Kentucky, the doctrine of illusory coverage may invalidate an insurance policy exclusion if it is "so broadly drawn as to obfuscate its purpose." *Chaffin v. Kentucky Farm Bureau Ins. Companies*, 789 S.W.2d 754, 757 (Ky. 1990). In *Chaffin*, the insured sought uninsured motorist coverage under three separate automobile insurance policies. Although the insurer paid the insured's claim for uninsured motorist coverage with respect to the policy covering the car in which she was injured, it denied coverage with respect to the other two policies on the grounds of an "other vehicle exclusion" which excluded coverage "for bodily injury sustained by any person… [w]hile occupying, or when struck, by any motor vehicle owned by you or any family member which is not insured for this coverage under this policy." *Id.* at 755. According to the insurer, the exclusion was:

> designed to prevent the stacking of the uninsured motorist provisions of two or more policies in a narrowly defined fact situation where collusive lawsuits are thought more likely to occur. The exclusion prevents the stacking of two or more

11

uninsured motorist coverages where one is injured while occupying or struck by a motor vehicle owned by the insured or one of the insured's family members.

*Id.* at 756.

Citing its earlier decision in *Brown v. Gosser*, 262 S.W.2d 480, 484 (Ky. 1953), the Kentucky Supreme Court concluded that the insurer's "fraud and collusion" argument lacked merit because "the need for [uninsured motorist] coverage is rare and this produces a greater likelihood of detection in the event of attempted collusion." *Id.* Furthermore, the court explained that:

> the other vehicle exclusion relied upon by appellee is so broadly drawn as to obfuscate its purpose in prevention of fraud, if indeed such is its primary purpose. To prevent collusive suits it might be appropriate to narrowly prohibit stacking in those instances when a legitimate probability of collusion exists. However, the exclusion as drafted by appellee prohibits claims in a multitude of circumstances in which collusion is not a reasonable possibility. Certainly nothing in the facts stipulated herein suggests any possibility of collusion.

*Id.* at 757. Accordingly, the court invalidated the exclusion on the grounds that "the coverage bought, paid for and reasonably expected is "illusory" because "coverage is given and then taken away by means of an other vehicle exclusion." *Id.*

In *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121 (Ky. Ct. App. 2012), the Kentucky Court of Appeals expounded on the doctrine of illusory coverage as set forth in *Chaffin*. As explained by the court, *Chaffin* spoke of illusory coverage as "coverage that is at least implicitly given under its provisions and then taken away, whether by virtue of a prohibition or exclusion contained in the same policy, or by virtue of a strict legal definition." *Id.* at 129. Citing *Jostens, Inc. v. Northfield Ins. Co.*, 527 N.W.2d 116, 119 (Minn. App. 1995), the court explained that "the doctrine of illusory coverage is best applied... where part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent." *Id.* at 119.

In the case at bar, Defendants argue that the violation-of-statutes exclusion renders the policies illusory because, on the one hand, coverage is provided for "bodily injury" and "personal and advertising injury," while on the other hand coverage is excluded for *any* violation of *any* statute that addresses or applies to the sending, transmitting or communicating of any material or information, committed by *any* person by *any* means whatsoever. Contrary to this argument, however, the policies' definition of "personal and advertising injury" as "injury… arising out of… oral or written publication in any manner, of material that violates a person's right of privacy" is in no way restricted to injuries arising from violations of statutes. Accordingly, the exclusion does not render the coverage illusory because, unlike the exclusion in *Chaffin*, the exclusion does not *entirely* negate the policies' coverage for "personal and advertising injury." Indeed, in the absence of an act that violates a statute addressing the communication of information, the policies would still provide coverage for "injury… arising out of… oral or written publication in any manner, of material that violates a person's right of privacy." For these reasons, the Court concludes that the policies' coverage is not rendered illusory by the violation-of-statutes exclusion.

Second, Defendants argue that the exclusion frustrates their reasonable expectations of coverage by ambiguously excluding coverage for statutory violations which an ordinary insured would reasonably expect to have been covered by the "bodily injury" and "personal and advertising injury" provisions. According to Defendants, the exclusion is ambiguous insofar as it "fails to define the operative terms, including the individuals and situations to which it applies, provides no standards for determining whether Papa John's acts were intentional…, and fails to specify, identify, or define the statutes to which it would apply." (Resp., DN 26, at 24).

13

In Kentucky, the doctrine of reasonable expectations provides that "the insured is entitled to all the coverage he may reasonably expect to be provided under the policy." *Simon v. Continental Insurance Co.*, 724 S.W.2d 210, 212 (Ky. 1986). Accordingly, "Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Id.* Importantly, however, "Reasonable expectations are not ascertained from the subjective belief, however genuine, of the insurance applicant." *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 128 (Ky. Ct. App. 2012). Rather, "the test in determining reasonable expectations is based on construing the policy language as a layman would understand it, rather than considering the policyholder's subjective thought process regarding his policy." *Id.* (citing *Estate of Swartz v. Metropolitan Property & Cas. Co.*, 949 S.W.2d 72, 75 (Ky. Ct. App. 1997)). Finally, "Only actual ambiguities in the policy language will trigger the doctrine of reasonable expectations." *Id.* (citing *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003)).

After careful review, the Court concludes that the reasonable expectations doctrine is inapposite because the exclusion is unambiguous. Although Defendants argue that the exclusion is ambiguous because it "fails to define the operative terms, including the individuals and situations to which it applies, provides no standards for determining whether Papa John's acts were intentional…, and fails to specify, identify, or define the statutes to which it would apply," these arguments focus on the *breadth* of the exclusion, rather than its *ambiguity*. For instance, while it is true that the exclusion fails to specify "the individuals and situations to which it applies" or "the statutes to which it would apply," this failure does not render the exclusion ambiguous because it nevertheless remains reasonably susceptible to only one meaning. Regardless of which "individuals and situations to which it applies" or "the statutes to which it

14

would apply," the exclusion's meaning is clear: there is no coverage for injuries caused by any person's violation of any statute relating to the transmission or communication of material or information. Accordingly, because "[o]nly actual ambiguities in the policy language will trigger the doctrine of reasonable expectations," *Sparks*, 389 S.W.3d at 128, the reasonable expectations doctrine is of no avail to Defendants.

Finally, Defendants argue that the exclusion renders the policy self-contradictory. However, because Defendants base this argument on the same grounds as their illusory coverage argument, the Court will not separately address it.

Having considered each of Defendants' objections to the violation-of-statutes exclusion and found them to be without merit, the Court concludes that any coverage otherwise existing under the policy was effectively negated by the exclusion. Accordingly, the Court will grant the motion for summary judgment filed by Plaintiffs and will deny the motion for summary judgment filed by Defendants.

On April 24, 2014, Plaintiffs filed a motion for leave to file supplemental authority (DN 50) on the grounds that the Court of Appeals for the Eleventh Circuit had recently issued its opinion in a case relevant to the merits of the case at bar. In response, Defendants opposed the motion for leave to file supplemental authority on the grounds that the Eleventh Circuit's decision "provides no legal basis on which National Union can rest its arguments." (Response, DN 51, at 1). Because the Court did not rely on any authority contained in the motion for leave to file supplemental authority filed by Plaintiffs, the Court will deny the motion as moot.

A separate order will be entered in accordance with this opinion.

**Charles R. Simpson III, Senior Judge**
**United States District Court**

15

July 3, 2014